IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RUSSELL TENORIO,

Plaintiff,

vs.

Civ. No. 12-01295 MCA/KBM
Consolidated with
Civ. No. 13-00574 MCA/KBM

BRIAN PITZER,
RAYMOND D. SCHULTZ, and
THE CITY OF ALBUQUERQUE,

Defendants.

**MEMORANDUM OPINION AND ORDER**

This case is before the Court upon Defendant Brian Pitzer's[1] *Opposed Motion for Summary Judgment on Qualified Immunity Grounds* [Doc. 64]. The Court has considered the written submissions of the parties, the record in this case and the applicable law, and is otherwise fully advised.

**Summary Judgment Standards**

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim . . . on which summary judgment is sought." As our Court of Appeals has succinctly stated:

> Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . .the moving party is entitled to a judgment as a matter of

[1] The Court has not considered this motion with respect to Officer Liccione, who was not a party to the suit against Defendant, Civ. No.12-1295, when Defendant filed his motion. The Court's denial of Defendant's motion is without prejudice to Officer Liccione.

> law." A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented.

*Adamson v. Multi Community Diversified Serv., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).

**Legal Standards Applicable to a Dispositive Motion Based on Qualified Immunity**

> Resolution of a dispositive motion based on qualified immunity involves a two pronged inquiry. "First, a court must decide whether the facts a plaintiff has alleged or shown make out a violation of a constitutional right." "Second, . . . the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." "With regard to this second [prong], the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances presented." A reviewing court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." "Qualified immunity is applicable unless" the plaintiff can satisfy both prongs of the inquiry.

*Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (citations omitted).

**Background**

The Court has drawn the following facts from the record. The Court has taken as true those facts which the parties agree are undisputed. Wherever the facts are disputed and the evidence is in conflict, the Court has construed the evidence in the light most favorable to Plaintiff as the nonmovant. *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012) (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011); *Thomson v. Salt Lake County*, 584 F.3d 1304, 1318 (10th Cir. 2009) ("In determining

whether a plaintiff's constitutional rights were violated we ordinarily, as here, adopt plaintiff's version of the facts, insofar as it is supported by the record.").

On November 11, 2010, at 7:56 p.m., a 911 operator received a call from a woman who tells the operator "I need someone to come over here right away." A transcript of the conversation between the woman and the 911 operator is attached as Exhibit B to Defendant's Motion [Doc. 64-1]. The woman, subsequently identified as Hilda Valdez, reports that her sister-in-law's husband, "Russell," is intoxicated and is holding a knife to his throat. Ms. Valdez explains that she is afraid that Russell will hurt himself or his wife.

The 911 operator relays information provided by Ms. Valdez to the APD dispatcher [Doc. 92-4 at 2]. The officers do not hear the conversation between Ms. Valdez and the 911 operator; the only information they receive is that relayed to them by the dispatcher [Doc. 92-4 at 2]. APD Officers Moore, Hernandez, Liccione are dispatched in response to the call; Defendant also responds [Doc. 92-3 at 2]. Each officer is driving a separate vehicle [Doc. 92-3 at 2]. The dispatcher relays to the responding officers the information set out in Exhibit C to Defendant's Motion [Doc. 64-2]. The officers are informed that there are no injuries reported; that the male subject is drunk, has a knife to his throat and has vandalized windows; that the subject has been violent in the past;[2] that the subject takes meds for seizures"; that the caller, the subject, the subject's wife and the subject's brother are also present inside the location; and, that the subject is in the kitchen waiving

---

[2] This was in fact a misstatement by the 911 operator [Doc. 64-1 at 4]. But for purposes of assessing the reasonableness of Defendant's conduct, this misstatement cannot be held against Defendant, who did not overhear the actual conversation between the 911 operator and Ms. Valdez.

the knife around. At 8:03:44 p.m. the dispatcher informs the officers that the caller and her sister are in the living room. At 8:03:52 p.m. the dispatcher informs the officers that the "offender" and his brother are in the kitchen.

Defendant, Officer Moore, and Officer Hernandez arrive on scene between approximately 8:03 and 8:04 p.m. [Doc. 64-2 at 2]; Officer Liccione arrives at 8:04:38 p.m. [Doc. 64-2 at 2; Doc. 64-10 at 1] The officers do not have their emergency equipment engaged [Doc.92-3 at 3]. The officers park their vehicles a short distance down the street from Plaintiff's residence [Docs. 92-3 at 4; 92-9 at 2]. A minute or so later the officers approach Ms. Valdez, who is standing outside Plaintiff's residence still speaking to the 911 operator [Doc. 64-7 at 1]. Ms. Valdez clearly appears frightened [Doc. 92-4 at 3]. Officer Moore peremptorily orders Ms. Valdez to disconnect her 911 call [Doc. 64-7 at 1]. Defendant's belt recorder records[3] Ms. Valdez saying "He's got a knife. He's been drinking . . . He's like thirty-seven, thirty-eight years old. Um, we tried to talk to him but he got mad 'cause we took his beer away from him" [Doc. 64-7 at 1]. The officers do not ask Ms. Valdez if there is a hostage situation [Doc. 64-10 at 4]. Defendant, who has not received crisis intervention training [Doc.64-9 at 7], immediately announces "going lethal" [Doc. 64-7 at 1].

Without settling on a tactical plan [Docs. 64-10 at 1; 92-3 at 5-6], the officers assume an impromptu formation outside the front door to Plaintiff's residence [Doc. 92-5 at 4]. The officers are in uniform [Doc. 92-2 at 4]. Defendant is in front, with his

---

[3] Inexplicably, neither party provided the Court with a copy of the the audio recording made by Defendant's belt recorder.

handgun drawn. Officer Moore is behind Defendant, carrying a Taser. Officer Liccione is third, with his handgun drawn. [Doc. 92-9at 2]Officer Hernandez is behind the other officers, carrying a shotgun loaded with beanbag rounds, but is temporarily occupied in preventing Ms. Valdez from reentering the residence [Doc. 92-7 at 2]. The front door is open [Doc. 92-5 at 4]. A lamp is on in the living room [Doc. 92-1 at 3]. The living room is about 14' by 16,' with the front door on one of the shorter walls [Doc. 92-8 at 1]. From his position outside the front door, Defendant sees two doorways on the opposite wall, one to his left, and another to his right, directly across from the front door. It is apparent that part of the kitchen area is to the left of the right doorway, behind the living room wall, and cannot be viewed from Defendant's position [Doc. 92-8 at 2]. The officers do not hear raised voices or other sounds suggesting a disturbance. Without announcing his presence [Doc. 92-10 at 3], Defendant enters the living room through the front door, followed by Officers Moore and Liccione. A woman moves into the area of the kitchen visible through the right doorway [Doc. 92-1 at 2]. Defendant calls out "Ma'am," followed by "Please step out here. Let me see your hands, okay?" [Doc. 64-7 at 2] At least one of Defendant's fellow officers understands the command "Please step out here" to be addressed to everyone in the kitchen [Doc. 92-9 at 2; Doc. 92-10 at 2]. As the woman responds to Defendant's order, she says to someone in the kitchen, "Russell, put that down" [Doc. 64-7 at 2]. The woman walks through the doorway into the living room with her hands up and her palms facing the officers [Doc. 92-5 at 3], followed by a man with a blank stare [Doc. 92-9 at 2] who is carrying a santoku-style kitchen knife with a three-and-

a-quarter-inch sheepsfoot blade [Doc. 64-4]. The man is holding the knife loosely in his right hand, his arm hanging by his side, as he walks forward behind the woman [Doc. 92-1 at 2, 3]. Behind the first man is a second man, who also is moving out of the kitchen into the living room [Doc. 92-1 at 3]. Officer Hernandez, who has entered the living room after the other officers, grabs the woman and hustles her out the front door [Doc. 92-10 at 2] as the man with the knife walks forward into the living room at an "average" speed [Docs. 92-2 at 4; 92-10 at 3]. Defendant sees the knife and yells "Sir, put the knife down! Put the knife down, please! Put the knife down! Put the knife down!" [Doc. 64-7 at 2] When the man with the knife is about two and one-half steps into the living room, Defendant shoots the man, and simultaneously Officer Moore tases the man, who falls to the floor [Docs. 64-3 at 6; 92-1 at 4]. The commands and the shooting are compressed into no more than two or three seconds [Docs. 64-9 at 7; 64-10 at 2; 92-3 at 8]. The period of time between the first officer's arrival at the scene and the shooting is less than four minutes [Doc. 64-2 at 2].

**Discussion**

Claims that police officers employed excessive force in effecting a seizure of a free citizen are analyzed under the standards set out in *Thomson*, 584 F.3d at 1313-1315, 1320. The Court has carefully reviewed and considered those standards in the course of deciding Defendant's motion. Applying those standards, the Court concludes that Plaintiff has come forward with evidence that would enable a reasonable jury to find a Fourth Amendment violation under two theories.

The first theory is that when Defendant shot Plaintiff, Defendant did not have probable cause to believe that Plaintiff presented a threat of serious physical harm to Defendant or another person. *Id.* at 1313. This theory implicates the (non-exclusive) *Larsen* factors.[4] *Id.* at1314-15 (quoting *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)). As to the first *Larsen* factor, there is no dispute that Defendant ordered Plaintiff to drop the knife prior to shooting Plaintiff. However, this fact is offset by evidence that Defendant shot Plaintiff within two or three seconds of the first command to drop the knife [Doc. 92-1 at 4]. A reasonable jury could find that Defendant did not "refuse" to drop the knife because he was not given sufficient time to comply. A jury could conclude that the first *Larsen* factor is neutral as to the existence of probable cause. As to the second *Larsen* factor, the evidence viewed in the light most favorable to Plaintiff supports a finding that Plaintiff was holding a small kitchen knife loosely by his thigh and that he made no threatening gestures toward anyone [Doc. 92-3 at 10]. A reasonable jury could find that the second *Larsen* factor weighs against the existence of probable cause. As to the third *Larsen* factor, the distance between Plaintiff and Defendant is established by the dimensions of the living room noted above, reduced by the distance that Defendant had moved into the living room and the two and a half

---

[4] The *Larsen* factors are: "'(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands;(2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.'" *Zia Trust Co. v. Montoya*, 597 F.3d 1150, 1154 (10th Cir. 2010) (quoting *Estate of Larsen*, 511 F.3d at 1260). The Court understands the first, third and fourth *Larsen* factors as primarily bearing on a knife-wielding subject's apparent *intention* to harm the officer or another person, while the second *Larsen* factor addresses the subject's apparent *ability* to harm the officer or another person. Clearly, resort to deadly force is not objectively reasonable unless there are circumstances indicating to the officer that the subject has *both* the ability and the intention to harm.

steps that Plaintiff took into the living room [Doc. 92-2 at 3]. A jury could find that Plaintiff was shot as he was walking in Defendant's general direction,[5] but before he was within striking distance of Defendant [Doc. 64-6 at 3 ("[H]e was *getting* close enough to us to where it would have been a threat if he had made that decision [to raise the knife].") (emphasis added)].[6] A reasonable jury could find that this third factor also weighs against the existence of probable cause. As to the fourth *Larsen* factor, a reasonable jury could find that the information available to Defendant indicated that the only person that Plaintiff was known to have threatened that night was himself, and that as Plaintiff walked into the living room he did not raise the knife from his side or make threatening gestures or comments toward anyone. A jury could find that the fourth *Larsen* factor weighs against the existence of probable cause. *See Murphy v. Bitsoih*, 320 F. Supp. 2d 1174, 1191-92, 1193 (D. N.M. 2004) (reviewing cases involving use of deadly force; observing that "the courts uniformly required more than the mere presence of a knife near an officer to justify the use of lethal force"). The Court concludes that the evidence gives rise to a genuine issue of material fact as to whether Defendant had probable cause to believe that Plaintiff presented a threat of serious physical injury to Defendant, his fellow officers, or the civilian occupants of Plaintiff's residence. *See Cavanaugh v. Woods*

---

[5] As noted above, the record contains evidence that Defendant was standing directly across the living room from the doorway to the kitchen. In view of Defendant's position relative to the doorway to the kitchen, Plaintiff necessarily would have moved in Defendant's general direction in complying with the command to "please step out here," which as noted elsewhere, was understood by Officer Liccione to have been directed at everyone in the kitchen.

[6] A reasonable jury could find that at the point that Defendant shot Plaintiff, Michaele Tenorio had been hustled out of the living room by Officer Hernandez, and was no longer in harm's way. Under this view of the facts, Defendant could not reasonably have viewed Plaintiff as a threat to Michaele Tenorio.

*Cross City*, 718 F.3d 1244, 1253-54 (10th Cir. 2013) ("And 'where there is a question of fact or "room for a difference of opinion" about the existence of probable cause, it is a proper question for a jury. . . .'"; "principles from probable cause cases are equally applicable to our excessive force cases").

Plaintiff's alternative theory of liability is that Defendant and the other officers recklessly and unreasonably created a situation giving rise to Defendant's resort to deadly force. The dispatcher had informed the officers shortly before they arrived that the two women inside Plaintiff's residence were in the living room, not the kitchen, and when the officers arrived, Ms. Valdez was waiting outside in the driveway. Thus, the record contains evidence that Defendant and the other officers knew or should have known that they were not confronting a situation in which Plaintiff was holding persons inside against their will. The officers knew that Ms. Valdez had been inside just a few minutes before [Doc. 64-2 at 2]. Yet, Defendant and the other officers did not ask Ms. Valdez about the situation inside the house.[7] *See Sevier v. City of Lawrence Kansas*, 60 F.3d 695, 701 n.10 (10th Cir. 1995) (citing officers' failure to obtain more information about armed suicidal subject's condition as evidence of reckless conduct precipitating use of deadly force). There is no evidence that after they arrived, Defendant or the other officers heard loud voices or other sounds of a disturbance coming from inside the residence. Defendant and the other officers knew from the information transmitted by the

---

[7] Ms. Valdez could have provided crucial information such as the facts that Plaintiff had not threatened or harmed anyone and that Plaintiff was not holding anyone hostage. Ms. Valdez could have corrected the erroneous information provided by the dispatcher that Plaintiff had been violent in the past.

dispatcher that no one had been injured, and that the only person the subject had threatened was himself. Yet, within a minute or two after arriving, Defendant and Officer Liccione had drawn their side arms, "going lethal." Although Officer Moore and Officer Liccione had received crisis intervention training, neither officer attempted to employ that training [Doc. 64-6 at 2; Doc. 64-10 at 4]. Defendant and the other officers did not attempt to resolve the situation verbally (as for example by calling into the residence directing the occupants to come outside), even though that was an option [Doc. 64-10 at 4]. *Cf. Myers v. Oklahoma County Bd. of County Comm'rs*, 151 F.3d 1313, 1320 (10th Cir. 1998) (emphasizing evidence that officers had spent hours trying to resolve situation through non-confrontational communication with subject). Since Defendant could see into the living room through the open front door [Doc. 64-9 at 3], he would have been aware that due to the small size of the room and the placement of furnishings it would be difficult or impossible for Defendant and the other officers to maneuver once they were inside. According to Officer Liccione, officers are trained to treat a person armed with a knife as a lethal threat when the person is within 21 feet of the officer. *See Murphy*, 320 F. Supp. 2d at 1182; *but see Edged Weapon Defense: Is or was the 21-foot rule valid (Part 1)*(observing that contrary to common misunderstanding of the "21-foot rule," "[a] suspect with a knife within 21 feet of an officer is POTENTIALLY a deadly threat"), available online at http://www.policeone.com/edged-weapons/articles/102828-Edged-Weapon-Defense-Is-or-was-the-21-foot-rule-valid-Part-1/ (last visited April 10, 2014). Given the dimensions of Plaintiff's living room, an entry

into the living room greatly increased the chances that Plaintiff, if he were still holding a knife, would automatically be perceived as a lethal threat justifying the use of deadly force. Moreover, since a short distance between an officer and a subject translates into a short time to react, the decision to enter the confines of the living room necessarily limited Defendant's opportunity to communicate with Plaintiff prior to employing deadly force. Due to the limited space within the living room, the bean bag rounds were not a non-lethal option [Doc. 92-3 at 10]. Lastly, Defendant and his colleagues did not even attempt to formulate a tactical plan prior to entering the residence. On this evidence a reasonable jury could find that Defendant and the other officers acted recklessly by barging into the residence with deadly force deployed.

Having determined that there are genuine issues of material fact that if resolved in Plaintiff's favor would support a finding that Plaintiff was subjected to excessive force in violation of his Fourth Amendment rights, the Court must decide if the law on which Defendant's liability turns was clearly established on November 11, 2010. Whether the law is clearly established in an excessive force case is evaluated under the standards set out in *Fancher v. Barrientos*, 723 F.3d 1191, 1201 (10th Cir. 2013) (quoting *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007)).

*Zia Trust Co. v. Montoya*, 597 F.3d 1150 (10th Cir. 2010); *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006); *Zuchel v. City and County of Denver, Colo.*, 997 F.2d 730; *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 700-701 (10th Cir. 1995); *Murphy v. Bitsoih*, 320 F. Supp. 2d 1174 (D. N.M. 2004); *Diaz v. Salazar*, 924 F.

Supp.1088 (D.N.M. 1996) provided Defendant with sufficient notice of established Fourth Amendment limitations on his use of deadly force. In particular, the *Larsen* factors were well established in Tenth Circuit case law as of November 11, 2010. In view of these decisions, no reasonable officer could have believed that it was lawful to shoot Plaintiff, even though he was holding a small knife, when: (1) the officer was present in response to a 911 call concerning a subject threatening to harm himself, rather than a crime in progress (2) the officer knew or should have known that Plaintiff had not harmed anyone (3) the officer knew or should have known that Plaintiff was not holding anyone against his will (4) after arriving, the officer had not heard raised voices or other sounds of a disturbance (5) Plaintiff was calmly walking forward out of the kitchen (6) Plaintiff was not told to halt (7) Plaintiff was not given a reasonable time to comply with the order to drop the knife (8) Plaintiff did not appear belligerent or agitated (9) Plaintiff was holding the knife loosely by his side and did not raise the knife or make any threatening gestures or remarks and (10) Plaintiff was not yet within striking range of the officer. Likewise, the principle that reckless conduct that unreasonably precipitates a use of deadly force violates the Fourth Amendment was well established. *Thomson*, 584 F.3d at 1320; *Allen v. Muskogee Okla.*, 119 F.3d 837, 840-41 (10th Cir. 1997); *Sevier*, 60 F.3d at 701; *see also Hastings v. Barnes*, 252 Fed. Appx. 197, 203 (10th Cir. 2007) (unpublished opinion)[8]; *Murphy*, 320 F. Supp. F.2d at 1193 (concluding that "[c]learly

[8] As an unpublished opinion, *Hastings* is not by itself dispositive of the question of whether the law was clearly established; but its holding that the officers unreasonably precipitated the necessity of deadly force nevertheless may contribute to a conclusion as to whether the law was clearly established as of November 11, 2010. *Estate of*

established law in the Circuit . . . holds that an officer is responsible for his or her reckless conduct that precipitates the need to use force."). Given that there was no report of injuries, no sounds of a disturbance, no reason to believe that the occupants were being held against their will, and no information suggesting that Plaintiff had threatened another person, no reasonable officer could have believed that it was appropriate to barge into Plaintiff's house with deadly force deployed without formulating a tactical plan taking into account known or readily available information, and without consulting Ms. Valdez, who had recently been inside. The present case is merely an example of the application of settled law to a new, but in no way unusual, set of facts. *See Estate of Booker*, 745 F.3d 405, 427 (10th Cir. 2014). ("In the Fourth Amendment context, we have said that 'because excessive force jurisprudence requires an all-things-considered inquiry with careful attention to the facts and circumstances of each particular case, there will almost never be a previously published opinion involving exactly the same circumstances. We cannot find qualified immunity whenever we find a new fact pattern.'"). The law as it existed on November 11, 2010 gave Defendant fair notice of Fourth Amendment limitations on his use of deadly force.

The Court must address one last matter: Defendant's objection to Plaintiff's Exhibits Nos. 6 and 8 [Docs. 92-6 and 92-8]. Defendant argues that that these two exhibits, excerpts from Plaintiff's expert reports, "have not been presented in admissible

---

*Booker*, 745 F.3d 405 (10th. Cir. 2014). Apart from its holding as to the merits of the plaintiff's Fourth Amendment claim, *Hastings* is informative in that the panel that decided *Hastings* believed that the law it applied was clearly established as of *August 23, 2002*, the date of the incident at issue in *Hastings*.

form since this information is unsworn and has not otherwise been shown to be admissible" [Doc. 103 at 1]. Under the forward-looking language of Fed. Civ. P. Rule 56(c)(2) the current *form* of the evidence is not dispositive of whether it may be considered in response to Defendant's motion. Since Plaintiff has identified experts, those experts presumably can be called at trial to testify to the opinions in their reports and the bases for those opinions. *Central Weber Water Improvement Dist. v. Ace Fire Underwriters Ins. Co.*, No. 1:12-CV-166 TS, 2014 WL 495152 *7 (D. Utah. Feb. 6, 2014). Sufficient authentication is provided by Defendant's concession that these exhibits are portions of Plaintiff's expert reports. Furthermore, pursuant to Fed. Evid. Rule 703, an expert may base his opinions on evidence that otherwise would be inadmissible. With one exception noted below, Defendant has not adequately explained why the evidence in Plaintiff's experts' reports "cannot be presented in a form that would be admissible in evidence." Defendant's objection is not well taken. Defendant, citing *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001), objects to the opinion of Plaintiff's police procedures expert, Roger A. Clark, that "[n]one of the officers at the scene (including Officer Pitzer) followed the expected and required tactical protocols necessary for dealing with a mentally impaired, suicidal and possibly armed (with a knife) subject" [Doc. 92-6 at 2]. This is a facially proper objection, as it goes to the *content or substance* of Plaintiff's evidence, not merely its current form. *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010). At this point in time, the Court need not decide whether *Medina* requires the exclusion of Mr. Clark's opinions, *cf.*

*Cavanaugh*, 718 F.3d at 1250 (endorsing use of police practices expert to "connect the dots" on whether the circumstances facing defendant officer justified his use of force), because the Court is satisfied that with Mr. Clark's opinions set aside and given no weight the remaining evidence before the Court raises genuine issues of material fact precluding summary judgment on the defense of qualified immunity.

**WHEREFORE, IT IS THEREFORE HEREBY IS ORDERED** that Defendant Brian Pitzer's *Opposed Motion for Summary Judgment on Qualified Immunity Grounds* [Doc. 64] is **denied**.

**So ordered this 28th day of May, 2014.**

M. CHRISTINA ARMIJO
Chief United States District Judge